## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURE SOURCE CLAIMS COMPANY, LLC, as assignee of 125 BROAD CHP, LLC,<br><br>     Plaintiff,<br><br>v.<br><br>EDWARD F. MILLER, FINE CRAFTSMAN GROUP, LLC, a New York Limited Liability Company, USDG, LLC, a Nevada Limited Liability Company, MIKE ROE, ROE SITE MANAGEMENT, LLC, a New York Limited Liability Company, MICHAEL PIUMELLI, GIOVANNA BATTAGLIA, and MARGARET MILLER,<br><br>     Defendants. | Case No.:<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

     Plaintiff, SECURE SOURCE CLAIMS COMPANY, LLC, as assignee of claims from 125 Broad CHP, LLC ("Plaintiff"), by and through undersigned counsel, hereby files this Complaint against Defendants, EDWARD F. MILLER ("Ed Miller"), FINE CRAFTSMAN GROUP, LLC ("FCG"), USDG, LLC ("USDG"), MIKE ROE ("Roe"), ROE SITE MANAGEMENT, LLC ("RSM"), MICHAEL PIUMELLI ("Piumelli"), GIOVANNA BATTAGLIA ("Giovanna Battaglia"), and MARGARET MILLER ("Margaret Miller") (collectively, "Defendants"), and in support thereof, allege as follows:

### SUMMARY OF THE FACTS

     1.    This matter concerns an egregious and explicit scheme and pattern of misconduct by an enterprise made up of Defendants intent on defrauding 125 Broad CHP, LLC ("125 Broad") of millions of dollars for their own benefit. 125 Broad is the owner of an energy co-generation

project being installed at 125 Broad Street, New York, New York (the "125 Broad Project" or the "Project").

2.      The 125 Broad Project was created, in addition to other projects at large commercial buildings throughout New York City, in response to New York City's recently passed Local Law 97 which requires that buildings over 25,000 square feet reduce their carbon emissions by 40 percent by 2030 and 80 percent by 2040 in an effort to carry out New York City's Green New Deal and reduce greenhouse emissions in New York City. The law provides substantial tax credits for those buildings that comply but also provides that all buildings covered by Local Law 97 will be required to file a report with the city by May 1, 2025, detailing their annual greenhouse gas emissions and then by May 1 of every year after. The report must be certified by a registered design professional.  Those buildings that are not in compliance with the new law by 2025 will be subject to substantial civil penalties.

3.      125 Broad was one of the first companies to get involved in the installation and servicing of green energy generation technology in New York City commercial buildings that will allow those large commercial buildings to comply with New York City's Local Law 97.

4.      During his tenure overseeing 125 Broad, Ed Miller concocted a plan by which individuals and entities connected personally and professionally to Ed Miller submitted for payment, through 125 Broad's Construction Manager, FCG, fraudulent or fabricated invoices that many of the Defendants, including FCG, expressly knew had no legitimate connection to the 125 Broad Project. FCG then knowingly and intentionally submitted those invoices to 125 Broad – and specifically Ed Miller – despite FCG's fraudulent assurances to the owner of 125 Broad that such invoices had been "actually incurred" in connection with the Project – along with its own "management fee" of 4% added on top of such phony invoices, knowing full well that those

fraudulent invoices would be approved by Ed Miller and as a result, unwittingly paid by 125 Broad as though it were a legitimate project expense.

5.     The truth was finally revealed in April of 2022 when, after repeatedly being pressed by senior management of 125 Broad and Secure Source Energy, LLC ("SSE") for updated estimates to completion, Ed Miller admitted that the Project was actually millions of dollars over his previously provided budgets.

6.     Following that revelation, an examination of 125 Broad's records uncovered that of the egregious cost overruns, more than $600,000 were the result of the fraudulent invoices that had been certified and submitted by FCG and approved for payment by Ed Miller all through interstate means including email and phone, with many of those invoices being the result of fabrications and doctoring by Piumelli and Ed Miller themselves.

7.     For instance, RSM, which was not a legally established or registered entity prior to February 7, 2022, had been paid more than $581,600 between July 15, 2021, and April 11, 2022, in connection with invoices that were submitted for activities that purportedly included "union labor supervision" or "permit process supervision" despite the fact that the 125 Broad Project did not employ any union labor and hired a different contractor to obtain permits.

8.     Similarly, FCG had submitted by email from its New York headquarters to the headquarters of SSE in New Hampshire, and Ed Miller had approved, nearly $50,000 in payments to USDG- a company wholly owned and operated by Ed Miller, purportedly for a crane rental, despite the fact that USDG was not registered to operate in New York and had no involvement with the 125 Broad Project.

9.     Most egregiously, FCG actually submitted for 125 Broad's payment invoices for work performed on the homes of Ed Miller's then girlfriend (now spouse), Giovanna Battaglia in Hawthorne, New York and Ed Miller's mother, Margaret Miller, in Andes, New York.

10.    Knowing full well that these invoices were entirely unrelated to the 125 Broad Project, FCG submitted these invoices directly to Ed Miller for payment along with their own "management fee" as well. All told, Defendants received millions of dollars in fraudulently obtained benefits to the detriment of 125 Broad.

## JURISDICTION AND VENUE

11.    This Court has original jurisdiction in this action pursuant to 28 U.S.C. § 1331, inasmuch as the matter in controversy is brought for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

12.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. 1332 because Plaintiff is a citizen of a different state than each of the Defendants, Giovanna Battaglia, and Margaret Miller and this matter concerns more than $75,000, exclusive of interest and costs. Plaintiff is a Florida entity with all of its members residing in Florida. Further, 125 Broad is a Delaware entity with all of its members residing in Florida.

13.    To the extent this Court does not exercise diversity jurisdiction over all of Plaintiff's Claims, this Court also has jurisdiction over Plaintiff's state and common law claims, pursuant to the principles of supplemental jurisdiction and 28 U.S.C. § 1367 as those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the US Constitution.

14.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES & RELEVANT NON-PARTIES

15.     Plaintiff SECURE SOURCE CLAIMS COMPANY, LLC ("SSCC") is a Florida Limited Liability Company that is registered to do business in the State of New York. On October 13, 2022, 125 Broad, the owner of the co-generation project that is the subject of this lawsuit, assigned the claims asserted in this Action to SSCC by virtue of the attached executed Assignment of Claims and Causes of Action. *See* Ex. A attached hereto.

16.     Non-Party 125 Broad is a limited liability company organized and existing under the laws of the State of Delaware and has a principal place of business at 1 Cate Street, #100, Portsmouth, New Hampshire 03801. 125 Broad is a single purpose entity, wholly owned by Secure Source Master Holding Company, LLC, a Delaware entity, and is the owner of generation systems at 125 Broad St, New York, NY 10004, and as alleged herein, was damaged by the fraudulent and improper conduct of Defendants. As set forth above, on October 10, 2022, 125 Broad assigned the claims and causes of action asserted herein to SSCC by virtue of the Assignment of Claims and Causes of Action, attached as Exhibit A.

17.     Non-Party SSE is a Nevada corporation with a principal place of business located at 800 North Collier Blvd, Suite 204, Marco Island, Florida 34145. As alleged herein, SSE employed Piumelli and engaged Ed Miller as an independent contractor in connection with their services related to the 125 Broad Project.

18.     Defendant, Ed Miller is a citizen of the State of New York, residing at 282 Elmwood Ave., Hawthorne, New York and is otherwise, *sui juris*. Ed Miller is also the owner and principal of co-Defendant USDG. Ed Miller was hired by SSE as an independent contractor to, in part, oversee the 125 Broad Project. As alleged herein Ed Miller knowingly and intentionally

engaged in an organized pattern of misconduct with his co-defendants to defraud 125 Broad for his own benefit.

19.     Defendant, FCG, is a limited liability company organized and existing under the laws of the State of New York with a principal place of business at 74-06 Metropolitan Ave, Middle Village, NY 11379. FCG purports to be a full-service general contracting company serving the New York City Metropolitan area and served as the Construction Manager for the 125 Broad Project. Upon information and belief, the members of FCG are residents of California and New York. As alleged herein FCG knowingly and intentionally engaged in an organized pattern of misconduct with its co-defendants to defraud 125 Broad for its own benefit.

20.     Defendant, USDG, is a limited liability company organized and existing under the laws of the State of Nevada with a principal place of business listed as 500 N. Rainbow Blvd., Ste 300A, Las Vegas, Nevada 89107. Upon information and belief, Ed Miller is USDG's sole member. USDG is not registered with the State of New York to do business within the State. As alleged herein, although USDG had absolutely no role in connection with the 125 Broad Project, USDG and its principal, Ed Miller, knowingly and intentionally engaged in an organized pattern of misconduct with its co-defendants to defraud 125 Broad for its own benefit.

21.     Defendant, Roe, is a citizen of the State of New York and is otherwise, *sui juris*. At all material times, Roe was the representative of RSM responsible for overseeing all of its actions with respect to the allegations contained in this Complaint. As alleged herein, although Roe had absolutely no legitimate role in connection with the 125 Broad Project, Roe, individually and through his company, RSM, knowingly and intentionally engaged in an organized pattern of misconduct with his co-defendants to defraud 125 Broad for his own benefit.

22.     Defendant, RSM, is a limited liability company organized and existing under the laws of the State of New York with a principal place of business at 944 Bussey Hollow Road, Andes, New York, 13731. Upon information and belief, Roe is its sole member. As alleged herein, although RSM had absolutely no role in connection with the 125 Broad Project, RSM and its principal, Roe, intentionally engaged in an organized pattern of misconduct with its co-defendants to defraud 125 Broad for their benefit.

23.     Defendant, Piumelli, is a citizen of the State of New York, residing at 27 Barker Avenue, Apt. 1023, White Plains, NY 10601, and is otherwise, *sui juris*. At all material times, Piumelli served as a Manager of Special Projects for SSE and Ed Miller's assistant. Piumelli, together with Ed Miller knowingly and intentionally engaged in a pattern of creating and transmitting fraudulent invoices and ledgers that were used by Defendants to cover up the Defendants' fraudulent scheme.

24.     Defendant, Giovanna Battaglia, is a citizen of the State of New York, residing at 282 Elmwood Ave., Hawthorne, New York and is otherwise, *sui juris*. At all material times, Giovanna Battaglia was Ed Miller's girlfriend and later, his wife, and provided no services in connection with the Project.

25.     Defendant, Margaret Miller, is a citizen of the State of New York, residing at 4 Damgard Rd, Andes, New York and is otherwise, *sui juris*. At all material times, Margaret Miller was Ed Miller's mother and provided no services in connection with the Project.

## GENERAL ALLEGATIONS

26.     SSE is in the business of installing highly efficient distributed generation systems used to reduce a property's carbon footprint, provide valuable back-up generation and redundancy,

and generate significant economic return principally in Class A office properties and high-rise structures.

27.     125 Broad is an entity created for the purpose of developing a Class A office property located in Lower Manhattan at 125 Broad Street, New York New York, with cogeneration energy production capacity, high efficiency absorption cooling, high efficiency electric drive centrifugal chilling capacity, and thermal energy storage capability with the objective of reducing high-rise office buildings carbon footprint by more than 20% and reducing or eliminating Local Law 97 penalties.

28.     Local Law 97 requires that buildings over 25,000 square feet reduce their carbon emissions by 40 percent by 2030 and 80 percent by 2040 in an effort to carry out New York City's Green New Deal and reduce greenhouse emissions in New York City.

29.     125 Broad has developed extremely specialized technology to drastically reduce a large building's carbon emissions to ensure compliance with Local Law 97. Pursuant to this, 125 Broad began the Project as its pilot program. During the course and scope of his involvement with the Project, both Ed Miller and FCG gained extensive knowledge about the technology used to complete the Project as well as garnering connections in the construction industry through his association with 125 Broad.

30.     125 Broad entered into a written contract with East-West Construction, Inc. and then FCG – who employed many of the same principals as East-West Construction, Inc., including Eric Scott - to serve as Construction Manager for the Project.

31.     125 Broad's contract with FCG made it 125 Broad's representative for the Project and authorized FCG to act appropriately on its behalf in connection with the Project.

32.     As 125 Broad's Construction Manager, FCG agreed to serve as a fiduciary of 125 Broad and to maintain proper financial management for the Project. The contract specifically states that "[FCG] accepts the relationship of trust and confidence established between it and 125 Broad[.]"

33.     Ed Miller, as agent of 125 Broad, was responsible for coordinating with FCG and approving invoices which FCG would regularly submit and affirm were incurred directly in connection with the 125 Broad Project.

34.     Throughout the term of their involvement with the 125 Broad Project, Ed Miller and FCG submitted and unilaterally approved multiple invoices for payment by 125 Broad in which FCG and Ed Miller knowingly and intentionally certified that such expenses were "directly related to the active conduct" and that such work had actually been completed.

35.     As a result of these certifications and approvals, 125 Broad paid the amounts stated on these invoices.

36.     However, unbeknownst to 125 Broad at the time, armed with power and responsibility to oversee the Project, and with the coordination and cooperation of an enterprise composed of Ed Miller, FCG, USDG, Roe, RSM, and Piumelli, began a fifteen-month conspiracy using interstate means of communications, including phone and email, to steal more than one million dollars from 125 Broad under the guise of legitimately authorized charges for the Project. This misconduct was purposefully orchestrated unilaterally by the enterprise with the intention of betraying 125 Broad for their collective benefit.

37.     For example, Roe sent monthly invoices to FCG for ". . . [p]rovid[ing] Union Labor Supervision as required." The Project was a non-union job with labor provided through Segovia Construction, LLC. As such, no union labor supervision was required as there was no union labor

present working on the Project nor were there any threatened union actions against the Project. Accordingly, every invoice issued by Roe and RSM which was subsequently paid was fraudulent for a total of $581,600 spanning from July 15, 2021, through April 11, 2022.

38.     To cover up his scheme, Ed Miller regularly and knowingly misrepresented to 125 Broad and its principals that the Project was on budget, but repeatedly offered only excuses when asked to provide updated estimates to completion of the Project. It was only when Ed Miller first disclosed, in mid-February 2022 that the Project was $3,000,000 over budget that 125 Broad first began to learn the truth of Defendants' scheme.

39.     Less than a month later, in March of 2022, Ed Miller disclosed that the Project was actually $10,000,000 over budget.

40.     As a result, SSE terminated Ed Miller's independent contractor agreement for malfeasance in April 2022. Prior to his termination, 125 Broad, using interstate means of communication, routinely requested an estimate to completion budget to which Ed Miller routinely misrepresented as both forthcoming and would be in line with previous estimates. Shortly thereafter, Ed Miller founded his own co-generation company, M2 Energy, LLC along with Adam Muskal, the prior head of sales for SSE, which has sought to utilize 125 Broad's technology.

41.     Following his termination, 125 Broad undertook a review of the Project for the purpose of determining the true status of the Project and the source of the egregious cost overruns that were previously unknown to 125 Broad. It was at this time that 125 Broad discovered that Ed Miller had approved millions of dollars in charges that were not only unrelated to the Project but also directly benefited companies and individuals he either controlled (USDG) or had a personal relationship with (RSM and Roe). Neither USDG nor RSM provided any services to the Project.

42.     RSM was an unformed entity until it became a New York Limited Liability Company on February 7, 2022. Despite this, FCG sent several payments to RSM on behalf of 125 Broad prior to RSM's formation which were accepted by Roe personally.

43.     On July 15, 2021, RSM emailed an invoice for $23,500 to FCG for "Building Department coordination and Permit process supervision."

44.     FCG, as the Construction Manager of the Project with daily oversight of the activities actually being performed at the Project site, expressly knew that (1) RSM was providing no work for the Project itself; and (2) RSM was certainly not providing any sort of coordination with the Building Department or supervising permit processes. FCG and Ed Miller were also aware that 125 Broad itself paid a contractor to make all permit applications.

45.     Despite this clear and unequivocal knowledge, FCG still directed and submitted via electronic mail, the RSM July invoice to 125 Broad for payment, and also took a 4% fee for itself on that invoice. In submitting this invoice, FCG certified that "to the best of [its] knowledge, information and belief the [w]ork has progressed as indicated, the quality of the [w]ork is in accordance with the Contract Documents, and [FCG] is entitled to the [amount.]" FCG's owner, Krzysztof Pogorzelski signed AIA #125-8 in which his signature was notarized attesting to the fact that the reported expense figure was correct and factual which included a $23,500 payment to RSM.

46.     In furtherance of the fraudulent scheme, Ed Miller directed and approved the payment of RSM's July invoice as well as FCG's fee which was fraudulently paid through interstate means to Roe in place of RSM which was not yet an established legal entity. In so much as RSM was not established as a business entity at the time it issued its invoice on July 15, 2021,

its invoice reflects the entity name, Roe Site Management which did not exist until February 7, 2022.

47.     On August 10, 2021, RSM emailed an invoice for $27,800 to FCG for "Building Department coordination and Permit process supervision."

48.     FCG, as the Construction Manager of the Project with daily oversight of the activities actually being performed at the Project site, expressly knew that (1) RSM was providing no work for the Project itself; and (2) RSM was certainly not providing any sort of coordination with the Building Department or supervising permit processes. In fact, as of the date of this invoice, RSM was not an established legal entity, as stated previously.

49.     Despite this clear and unequivocal knowledge, FCG still directed and submitted via electronic mail, the RSM August invoice to 125 Broad for payment, and also took a 4% fee for itself on that invoice. In submitting this invoice, FCG certified that "to the best of [its] knowledge, information and belief the [w]ork has progressed as indicated, the quality of the [w]ork is in accordance with the Contract Documents, and [FCG] is entitled to the [amount.]"

50.     In furtherance of the fraudulent scheme, Ed Miller directed approved the payment of RSM's August invoice as well as FCG's fee.

51.     On or about August 30, 2021, FCG wired $27,800, and a $25 wire fee on behalf of 125 Broad to Defendant Roe on behalf of RSM for purported work that was not performed at all, or at the least, if performed, had absolutely nothing to do with the Project to which FCG and Ed Miller were overseeing as fiduciaries.

52.     On September 15, 2021, RSM emailed an invoice for $56,850 to FCG for "Building Department coordination and Permit process supervision."

53.     FCG, as the Construction Manager of the Project with daily oversight of the activities actually being performed at the Project site, expressly knew that (1) RSM was providing no work for the Project itself; and (2) RSM was certainly not providing any sort of coordination with the Building Department or supervising permit processes. Again, 125 Broad coordinated with its own contractor to make all permit applications.

54.     Despite this clear and unequivocal knowledge, FCG still directed and submitted via electronic mail, the RSM September invoice to 125 Broad for payment, and also took a 4% fee for itself on that invoice. In submitting this invoice, FCG certified that "to the best of [its] knowledge, information and belief the [w]ork has progressed as indicated, the quality of the [w]ork is in accordance with the Contract Documents, and [FCG] is entitled to the [amount.]"

55.     In furtherance of the fraudulent scheme, Ed Miller directed and approved the payment of RSM's September invoice as well as FCG's fee.

56.     On October 6, 2021, RSM emailed an invoice for $93,500 to FCG for "Permitting and Coordination and assistance with offsite Steel mock up[.]"

57.     FCG, as the Construction Manager of the Project with daily oversight of the activities actually being performed at the Project site, expressly knew that (1) RSM was providing no work for the Project itself; (2) RSM was certainly not providing any sort of permitting coordination nor were there any permitted offsite steel mock ups called for in the course and scope of the Project; and 3) RSM was not qualified to do any steel mock ups.

58.     Despite this clear and unequivocal knowledge, FCG still directed and submitted via electronic mail, the RSM October invoice to 125 Broad for payment, and also took a 4% fee for itself on that invoice. In submitting this invoice, FCG certified that "to the best of [its] knowledge,

information and belief the [w]ork has progressed as indicated, the quality of the [w]ork is in accordance with the Contract Documents, and [FCG] is entitled to the [amount.]"

59.     In furtherance of the fraudulent scheme, Ed Miller directed and approved the payment of RSM's October invoice as well as FCG's fee.

60.     On or about October 19, 2021, FCG wired $25,000, and a $25 wire fee from 125 Broad to RSM for purported work that was not performed at all, or at the least, if performed, had absolutely nothing to do with the Project to which FCG and Ed Miller were overseeing as fiduciaries.

61.     On or about November 1, 2021, FCG wired $38,500, and a $25 wire fee on behalf of 125 Broad to RSM for purported work that was not performed at all, or at the least, if performed, had absolutely nothing to do with the Project to which FCG and Ed Miller were overseeing as fiduciaries.

62.     On or about November 2, 2021, FCG again wired $30,000, and a $25 wire fee on behalf of 125 Broad to RSM for purported work that was not performed at all, or at the least, if performed, had absolutely nothing to do with the Project to which FCG and Ed Miller were overseeing as fiduciaries.

63.     On November 30, 2021, RSM emailed an invoice for $78,000 to FCG for "Building Department coordination and Permit process supervision."

64.     FCG, as the Construction Manager of the Project with daily oversight of the activities actually being performed at the Project site, expressly knew that (1) RSM was providing no work for the Project itself; and (2) RSM was certainly not providing any sort of coordination with the Building Department or supervising permit processes.

65.     Despite this clear and unequivocal knowledge, FCG still directed and submitted via electronic mail, the RSM November invoice to 125 Broad for approval and payment, and also took a 4% fee for itself on that invoice. In submitting this invoice, FCG certified that "to the best of [its] knowledge, information and belief the [w]ork has progressed as indicated, the quality of the [w]ork is in accordance with the Contract Documents, and [FCG] is entitled to the [amount.]"

66.     In furtherance of the fraudulent scheme, Ed Miller directed and approved the payment of RSM's November invoice as well as FCG's fee.

67.     On January 5, 2022, FCG wired $39,000 to RSM for "Consulting" despite its knowledge that RSM was not performing any work in connection with the Project and also submitted a 4% fee for itself.

68.     FCG, as the Construction Manager of the Project with daily oversight of the activities actually being performed at the Project site, expressly knew that (1) RSM was providing no work for the Project itself; and (2) RSM was certainly not providing any sort of "Consulting" for the Project.

69.     Despite this clear and unequivocal knowledge, FCG directed and then submitted via electronic mail, the RSM January invoice to 125 Broad for approval and payment, and also submitted for a 4% fee for itself on that invoice.

70.     In furtherance of the fraudulent scheme, Ed Miller directed and approved the payment of RSM's January invoice as well as FCG's fee.

71.     On January 7, 2022, FCG wired $40,000 to RSM on behalf of 125 Broad knowing full well that RSM provided nothing to the Project.

72.     On January 11, 2022, FCG wired $18,000 to RSM on behalf of 125 Broad knowing full well that RSM provided nothing to the Project.

73.     On February 11, 2022, FCG wired $75,000 to RSM on behalf of 125 Broad knowing full well that RSM provided nothing to the Project.

74.     Also on February 11, 2022, FCG included an $8,200 charge from RSM on its February 2022 expense report with invoice or back-up.

75.     On or about February 28, 2022, RSM submitted an invoice to FCG in connection with the Project for $82,750. The invoice purported to be for "Union Labor Supervision."

76.     FCG, as the Construction Manager of the Project with daily oversight of the activities actually being performed at the Project site, expressly knew that (1) RSM was providing no work for the Project itself; and (2) the Project was not being performed with "union labor" and thus no "union labor supervision" was necessary.

77.     Despite this clear and unequivocal knowledge, FCG still directed and submitted via electronic mail, the RSM February invoice to 125 Broad for payment, and also submitted a 4% fee for itself on that invoice.

78.     In furtherance of the fraudulent scheme, Ed Miller directed and approved the payment by email of RSM's February invoice as well as FCG's fee.

79.     On or about April 11, 2022, FCG wired $82,750, and a $25 wire fee from 125 Broad to RSM for purported work that was not performed at all, or at the least, if performed, had absolutely nothing to do with the Project to which FCG and Ed Miller were overseeing as fiduciaries.

80.     Also, during this time, Piumelli and Ed Miller had been working in conjunction to incorporate various unrelated invoices from RSM and USDG into the invoices which were sent to FCG who then sent them to 125 Broad after certifying that the invoices were an accurate representation of the work being conducted at the Project.

81.     This included fabricating invoices that were originally sent to Ed Miller individually for submission to 125 Broad, misrepresenting that such costs were incurred directly in connection with the 125 Broad Project.

82.     On March 1, 2022, FCG wired $39,000 to RSM on behalf of 125 Broad knowing full well that RSM provided nothing to the Project.

83.     Each payment was for services that RSM never rendered to the Project with FCG knowing full well that RSM provided nothing to the Project.

84.     Ed Miller's malfeasance was not limited only to payments made to RSM totaling $581,600, the value of the renovations performed on the homes of his wife and mother and payments made to his own company, USDG. Ed Miller's fraudulent conduct also extended to his gross mismanagement of 125 Broad Project itself. For instance, on or about February 2022, FCG, knowingly and intentionally submitted a fraudulent invoice on behalf of Romo Machine LLC in the amount of $800,000 despite the fact that less than $100,000 worth of steel was actually delivered to the Project. The invoice was electronically submitted by FCG to 125 Broad through interstate email which was summarily approved by Ed Miller with no explanation for the price increase.

85.     FCG was the Construction Manager in charge of overseeing the day-to-day operations of the Project and routinely paid invoices that it knew or should have known were improper. Further, FCG had several employees billing the Project for twenty to forty hours worked each week including a Project Executive, Construction Manager, Project Manager, Field Operations Manager, General Superintendent, MEP Superintendent, and APM, in addition to a twenty to thirty hours a week accountant. Some of these employees were rarely at the Project and did not contribute to the Project in any meaningful way. Furthermore, some of the aforementioned

individuals actually held full time employment elsewhere while purporting to be working full time on the Project.

86.     FCG also paid USDG numerous times on invoices for work that as the Construction Manager, certainly knew was not completed.

87.     On April 8, 2021, FCG wrote USDG a check for $38,900 supposedly for Invoice Number 210012 which corresponds to no actual work USDG performed for the Project.

88.     On November 4, 2021, FCG wrote USDG a check for $4,300 supposedly for a crane rental which USDG did not rent or have any involvement with obtaining for the Project.

89.     On November 18, 2021, FCG wrote USDG a check for $4,850 which corresponds to no actual work USDG performed for the Project.

90.     Ed Miller also pressured various subcontractors to submit plainly improper invoices. At one point, Ed Miller issued D&B Mechanical an unsolicited change order and then pressured it to invoice 125 Broad for work that was not completed and return the payment received to RSM allegedly for services rendered to Ed Miller personally and not related to the Project.

91.     In the course of its audit of the Project's expenses, 125 Broad also uncovered that Ed Miller had invoiced the Project for improvements made to a home owned by Ed Miller and Giovanna Battaglia and his parents' home, owned by Margaret Miller. For example, Ed Miller invoiced the Project for a $5,958.25 bill for work Ferguson Plumbing did at Giovanna Battaglia's home. All the while FCG was paying invoices at Ed Miller's direction without question due to Ed Miller's representations that he owned SSE. FCG knew that the payments to RSM were not Project related and made the payment, nonetheless.

**COUNT I**
**CIVIL RICO UNDER 18 U.S.C. § 1962(a) AGAINST DEFENDANTS ED MILLER, FCG,**
**USDG, ROE, RSM, AND PIUMELLI**

92.     Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

93.     Ed Miller, FCG, USDG, Roe, RSM, and Piumelli, all engaged in a pattern of racketeering activity, including at least two or more violations of 18 U.S.C. § 1343 by forming a scheme to defraud 125 Broad, using wires in furtherance of that scheme, and having the specific intent to deceive or defraud 125 Broad.

94.     The elements of a RICO claim are (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *Ogles v. Sec. Benefit Life Ins. Co.*, 401 F. Supp. 3d 1210, 1221 (D. Kan. 2019) (citing 18 U.S.C. § 1962(c)).

95.     The first element, conduct, is defined as leading, running, managing, directing, or participating either directly or indirectly in the conduct of the enterprise's affairs. *Compound Prop. Mgmt., LLC v. Build Realty, Inc.*, 462 F. Supp. 3d 839, 855 (S.D. Ohio 2020) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 177-79 (1993)). This extends to individuals who are knowingly carrying out the decisions of the enterprise. *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 792 (6th Cir. 2012).

96.     Here, Ed Miller was leading the enterprise by directing FCG to make payments on fraudulent invoices to USDG and RSM amongst other parties. Piumelli assisted in this direction. Meanwhile, Roe, RSM, and USDG were participating in the conduct of the enterprise's affairs by accepting the spoils of Ed Miller's misdeeds and creating invoices to be billed to FCG. FCG participated by submitting the invoices to 125 Broad and accepting up to a 4% fee each time it submitted an invoice it knew or should have known was for work not actually completed at the

Project. FCG also participated by submitting invoices to 125 Broad for reimbursement for labor that did not occur.

97.     The second element, an enterprise, includes any individual, partnership, corporation, association, legal entity, or group of individuals associated in fact. *Compound*, 462 F. Supp. 3d at 856. An enterprise need not be an entity and the plaintiff can allege an association in fact enterprise. *Id.* at 857. To make such a showing, the plaintiff must allege: (1) purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Id.* (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)). Furthermore, the plaintiff must provide the role of each defendant in the scheme rather than simply lumping them all together. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prod. Liab. Litig.*, 826 F. Supp. 2d 1180, 1201 (C.D. Cal. 2011).

98.     The plaintiff must show that the defendants had the specific intent to defraud with this being established by showing the existence of a plausible fraudulent scheme. *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

99.     Here, an enterprise was created with its purpose being to further the scheme to defraud 125 Broad, the associated parties were related via ownership or financial relationships, and this scheme occurred over the course of more than fifteen months which was sufficient for Ed Miller, FCG, USDG, Roe, RSM, and Piumelli to work in concert to defraud 125 Broad, its investors, and those unwitting subcontractors  of hundreds of millions of dollars as evidenced by RSM's invoices being overtly fraudulent as they were billing for union labor services on a non-union job. Moreover, there are countless invoices billed to the Project by FCG for work completed on Giovanna Battaglia's home and his parents' home despite Defendants' full knowledge that such work had no relationship to the 125 Broad Project.

100.    The third element, pattern, requires at least two acts of the racketeering activity within a ten-year period. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989). However, there is no magic number, and the plaintiff must only establish that there is both a relationship and continuity to the racketeering activities. *Id.* at 236-37. A relationship to show the existence of a pattern is indicated by temporal proximity of the acts, by common goal, methodology, and their repetition. *Cosmos Forms Ltd. v. Guardian Life Ins. Co. of America*, 113 F.3d 308. 310 (2d Cir. 1997). (citing *H.J. Inc.*, 492 U.S. at 239).

101.    Here, there was a clear pattern as evidenced by RSM's monthly invoice to the Project for work that was not completed amongst other fraudulent purchases made throughout the Project. Each of these were a continuation of the underlying criminal activity as they were all designed to defraud 125 Broad and its investors for the benefit of Defendants. Defendants also intended to defraud 125 Broad by billing it for various no-show employees and by FCG knowingly making payments to contractors for which there was no Project-related reason. There were also invoices submitted, using interstate commerce and methods of communications such as electronic mail and bank wires, and paid for the purchase of specific items not related to the Project nor were these items actually delivered or present at the Project site.

102.    There is also a clear pattern of wrongful conduct on the part of the Defendants in that, these parties now have extensive knowledge of the specialization necessary to install co-generation systems in accordance with Local Law 97. Due to the extreme specialization needed to install such systems, it is very likely that Defendants will use their knowledge to obtain contracts to install additional co-generation systems in buildings subject to Local Law 97 and overcharge those building owners as they overcharged 125 Broad.

103.    The fourth element, racketeering activity, occurs when the defendant is alleged to have committed certain predicate acts which are specified state or federal offenses. *Ogles*, 401 F. Supp. 3d at 1221; *see also RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 329-30 (2016).

104.    Here, Ed Miller, FCG, USDG, Roe, RSM, and Piumelli engaged in wire fraud in violation of 18 U.S.C. § 1343, while Ed Miller also engaged in extortion under New York law. Violation of § 1343 is specifically delineated as a racketeering activity under § 1961(1)(B). The elements of wire fraud are: (1) a scheme to defraud; (2) use of wires in furtherance of the scheme; and (3) use of wires with specific intent to deceive or defraud. *Capitol West Appraisals, LLC v. Countrywide Fin. Corp.*, 759 F. Supp. 2d 1267, 1272 (W.D. Wash. 2010). The wire must be part of the execution of the scheme. *U.S. v. Jinian*, 725 F.3d 954, 961 (9th Cir. 2013) (citing *Schmuck v. U.S.*, 489 U.S. 705, 715 (1989)). Additionally, the wire fraud must involve the use of the wire in interstate commerce. *Jinian*, 725 F.3d at 965. However, it is possible for a wire communication whose origin and ultimate destination are within a single state to be routed through another state. *U.S. v. Siembida*, 604 F. Supp. 2d 589, 597 (S.D.N.Y. 2008) (citing *Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 265 (2d Cir. 2004), *rev'd on other grounds,* 547 U.S. 451 (2006)).

105.    Defendants, particularly, Ed Miller, FCG, Piumelli, RSM, Roe and USDG, manufactured and submitted  fraudulent invoices that all of these defendants knew were fraudulent based on their active role in the scheme – particularly FCG's role as Construction Manager and Ed Miller's role as President giving them knowledge that the work RSM, USDG and others were billing for – at the direction of FCG and Miller – was never performed in connection with the 125 Broad Project. Upon receipt of the first invoice from RSM in July 2021, FCG should have at the very least, brought to the attention of 125 Broad that the invoices were for supervision of union labor and "labor harmony." Instead, it evidenced its compliance and involvement with the scheme

by continuing to pay these invoices rather than signaling such blatant issues to 125 Broad costing 125 Broad $581,600.

106.     As discussed above, Ed Miller, FCG, USDG, Roe, RSM, and Piumelli concocted a scheme to defraud 125 Broad by charging fraudulent and irrelevant invoices to the Project. Ed Miller and Piumelli used wires to make communications to FCG directing it to pay invoices unrelated to the Project to an upstate New York company and a Nevada company, RSM and USDG respectively. Furthermore, these directions came from Ed Miller's SSE email. SSE is incorporated in Nevada and has its principal place of business in Connecticut. Moreover, the wires were used to execute the scheme as Ed Miller used cellular towers and email to instruct FCG to pay the fraudulent invoices.

107.     However, even if the emails were all sent and received in New York, the communications still involved interstate commerce. Ed Miller's SSE email was a Gmail account. Similarly, RSM's email address was a Gmail account. Gmail is operated by Google which maintains its United States servers in: Alabama, Georgia, Iowa, Nevada, Nebraska, North Carolina, Ohio, Oklahoma, Oregon, South Carolina, Texas, and Virginia. GOOGLE, https://www.google.com/about/datacenters/locations/ (last visited July 29, 2022). Ed Miller elected to use an email provider, who at the time he sent his emails involving the scheme, had all its email servers based in another state. At the same time, RSM also sent plainly fraudulent invoices via an email provider which had all of its email servers based in another state.

108.     Meanwhile, Ed Miller also engaged in extortion under New York law. New York law defines extortion as occurring when a person obtains property by compelling or inducing another person to deliver said property by instilling a fear that failure to comply will cause a strike, boycott, or other collective labor group action injurious to some person's business. NY Penal §

155.05. Extortion is also one of the enumerated state offenses which fall under the definition of racketeering activity. *Segarra v. Messina*, 153 F.R.D. 22, 27 (N.D.N.Y. 1994) (citing 18 U.S.C. § 1961(1)). For example, Ed Miller's threat, sent via text message, to have the unions shut down the Project if the invoice sent by RSM went unpaid constitutes extortion under New York and is punishable as grand larceny in the second degree and thus carries with it a minimum sentence of one year. NY PENAL § 70(3)(b). This threat furthered the ongoing scheme as it was done to ensure that RSM's fraudulent invoice was paid.

109.   The racketeering and profiteering by Ed Miller, FCG, USDG, Roe, RSM and Piumelli has created a substantial threat of continuing harm to the public by reason of these Parties continued involvement in the cogeneration construction industry that has been created by New York City's Local Law 97 which will require all of New York City's large commercial buildings to seek out such projects. Defendants' fraudulent scheme and racketeering is akin to schemes concocted by organized crime in decades past and has injured many victims including 125 Broad and those that have invested in the Company's parent company, Secure Source Master Holding Company, LLC, as well as all of the subcontractors involved in the 125 Broad Project that were unwittingly duped into furthering Defendants' fraudulent scheme.

110.   As a direct and proximate result of Ed Miller, FCG, USDG, Roe, RSM, and Piumelli's racketeering activity, 125 Broad has been damaged. Furthermore, pursuant to 18 U.S.C. § 1964(c), 125 Broad is entitled to treble damages, costs, and attorney's fees, in an amount to be determined at trial.

## COUNT II
## CONVERSION AGAINST ED MILLER

111.   Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

112.     Ed Miller committed the tort of conversion by using the Project funds to enrich himself and his compatriots by deceiving 125 Broad with fraudulent invoices.

113.     In New York, the tort of conversion has two elements: (1) the plaintiff's possessory right or interest in the property and (2) the defendant's dominion over the property or interference with it, in derogation of the plaintiff's rights. *Colavito v. N.Y. Organ Donor*, 8 N.Y.3d 43, 50 (2006).

114.     Here, 125 Broad had a right to the Project funds by way of 125 Broad being ultimately in charge of the Project and its funding thereof. Meanwhile, Ed Miller exercised dominion over the funds by using the Project's funds to pay himself and his compatriots for services not rendered in connection with the Project. Ed Miller's conversion was fraudulent, willful and with conscious disregard of 125 Broad's rights.

### COUNT III
### BREACH OF FIDUCIARY DUTY AGAINST ED MILLER

115.     Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

116.     Ed Miller had a relationship with 125 Broad of trust and confidence giving rise to fiduciary duties which he subsequently breached.

117.     In order to establish a breach of fiduciary duty in New York, a plaintiff must prove: (1) the existence of a fiduciary relationship; (2) misconduct by the defendant; and (3) damages that were directly caused by the defendant's misconduct. *Kurtzman v. Bergstol*, 40 A.D.3d 588, 590 (N.Y. 2d Dept. 2007). Further, a fiduciary relationship can exist between an agent and principal. *Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409, 416 (2001). An example of misconduct under this is self-dealing which occurs when the fiduciary works for his own gain at the expense of the beneficiary.

118.   Here, Ed Miller was empowered to act as 125 Broad's agent. Second, Ed Miller engaged in misconduct by making the various improper expenses, misappropriating 125 Broad's funds, and making materially false statements to the detriment of 125 Broad. Ed Miller also engaged in misconduct by pressuring subcontractors to submit fake invoices and return the funds the project paid to them to him personally. Third, 125 Broad suffered damages by being deceived into paying for Ed Miller's various improper expenses.

119.   As a direct and proximate result of Ed Miller's breach of fiduciary duty, 125 Broad suffered damages.

**COUNT IV**
**COMMON LAW FRAUD AGAINST ED MILLER**

120.   Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

121.   Ed Miller engaged in both fraudulent inducement and fraudulent concealment as defined by New York law.

122.   To bring a claim for fraudulent inducement, the plaintiff must prove: (1) a misrepresentation or a material omission of fact which was false and known to be false by the defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance, and (4) injury. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011).

123.   Here, Ed Miller made a misrepresentation by conveying updates that the Project remained on budget despite the expenses clearly showing that the Project was over budget. Furthermore, he intended to defraud 125 Broad by making these representations in order to ensure that 125 Broad continued to fund the Project without question. 125 Broad reasonably relied on Ed Miller as its agent to look out for its best interests in a fiduciary capacity in his role as President. Lastly, 125 Broad suffered damages as it was deceived into paying money it would otherwise not

have had to pay, had Ed Miller not intentionally mislead 125 Broad into believing that his improper expenses were proper and that the Project was on budget. Therefore, Ed Miller is liable to Plaintiff for fraudulent inducement.

124.    Additionally, a claim for fraudulent concealment requires the plaintiff to allege that: (1) the defendant made a material misrepresentation of fact; (2) the misrepresentation was intentionally made to defraud or mislead the defendant; (3) the plaintiff reasonably relied on the misrepresentation; and (4) the plaintiff suffered damages as a result of its reliance. *Id.* (citing *P.T. Bank Cent. Asia, N.Y. Branch v ABN AMRO Bank N.V.*, 301 A.D.2d 373, 376 (N.Y. 1st Dept. 2003)). A plaintiff must also allege that the defendant had a duty to disclose material information and that it failed to do so. *P.T. Bank*, 301 A.D.2d at 376. A duty to disclose arises when: (1) the defendant speaks on a subject where he must speak truthfully about the matter; (2) there is a fiduciary relationship between the plaintiff and defendant; or (3) the defendant possesses special facts about the matter not known by the plaintiff. *Pramer S.C.A. v. Abaplus Int'l Corp.*, 76 A.D.3d 89, 99 (N.Y. 1st Dept. 2010).

125.    Ed Miller engaged in fraudulent concealment when he reported that the Project was on budget when it was actually over budget due to his malfeasance. This misrepresentation was intentionally made as Ed Miller was aware that the Project was over budget given his directions to 125 Broad to pay more to FCG each month than he reported in the budget and not submitting timely change orders so 125 Broad would become aware of the actual costs to complete. 125 Broad reasonably relied on these misrepresentations as it had no reason to believe that Ed Miller was misleading it or engaging in unscrupulous business practices. Ed Miller's conduct was also egregious and shocked the conscience. Further, 125 Broad suffered damages in the form of having its funds used for improper means due to its trust in Ed Miller. Lastly, Ed Miller owed 125 Broad

a duty to disclose material information because there was a fiduciary relationship between them

stemming from his position as President.

## COUNT V
## DIVERSION OF TRUST ASSETS AGAINST ED MILLER

126.    Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through

91, as if fully set forth herein.

127.    Ed Miller improperly diverted trust assets in violation of New York Law.

128.    Article 3-A of the Lien Law establishes that a trust fund is created by all funds

received by an owner, contractor, or subcontractor for in connection with an improvement of real

property. *LeChase Data/Telecom Servs., LLC v. Goebert*, 2 Misc. 3d 195, 200 (N.Y. Sup. Ct.

Monroe Cty. 2003) (citing N.Y. Lien Law § 70). "All funds" is an all-encompassing term which

includes payments made for almost any purpose with respect to a construction project. N.Y. Lien

Law § 70(5).

129.    Use of these trust assets for any purpose other than the intended one constitutes an

improper diversion of trust assets regardless of the trustee's intentions. *LeChase*, 2 Misc. 3d at 201

(citing *RLI Ins. Co., Surety Div. v. New York State Dept. of Labor*, 97 766 N.E. 2d 934 (N.Y.

2002)). The trust commences when the assets come into existence. *RLI*, 766 N.E. 2d at 938.

Additionally, a contractor is held out as a trustee of funds received on behalf of subcontractors and

are required to maintain books or records detailing the trust assets receivable, the trust assets

payable, trust funds received, trust payments made, and transfers in repayment of or to secure

advances made pursuant to a notice of lending. *Anthony DeMarco & Sons Nursery, LLC v. Maxim

Const. Service Corp.*, 130 A.D. 3d 1409, 1411 (N.Y. 3d Dept. 2015) (citing *In re Bette & Cring,

LLC v. Brandle Meadows, LLC*, 81 A.D. 3d 1152, 1153-54 (N.Y. 2011)). Ultimately, any use of

trust funds other than the payment of claims under the contract is an improper diversion of trust

assets and the failure of the trustee to keep required books and records is presumptive evidence that the trustee has applied or consented to the application of trust funds for purposes other than a purpose of the trust. *Anthony*, 130 A.D. 3d at 1411.

130.    Ed Miller improperly diverted trust funds by using money intended for subcontractors to fund his own schemes and to pay RSM and USDG. Furthermore, he was obligated to act as a fiduciary manager of the funds and thus owed 125 Broad a duty of loyalty and was required to administer the trust solely in the interest of the beneficiaries. *Aspro Mechanical Contracting, Inc. v. Fleet Bank, N.A.*, 805 N.E. 2d 1037, 1040 (N.Y. 2004). He breached this duty time and time again when he authorized fraudulent invoices to be charged to the Project.

## COUNT VI
## CONVERSION AGAINST FCG

124.    Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

125.    FCG committed the tort of conversion by using the Project funds to enrich itself and its employees.

126.    In New York, the tort of conversion has two elements: (1) the plaintiff's possessory right or interest in the property and (2) the defendant's dominion over the property or interference with it, in derogation of the plaintiff's rights. *Colavito*, 8 N.Y.3d at 50.

127.    Here, 125 Broad had a right to the Project funds by way of being ultimately in charge of the Project and its funding thereof. Meanwhile, FCG exercised dominion over the funds by using the Project's funds to pay several employees for work that was not done. Initially, FCG had two positions on the Project that did not meaningfully contribute to the Project. However, once its work on a different SSE project was completed, FCG's labor from that project was added to the Project superfluously. This was done for the sole purpose of continuing to employ now

unnecessary staff and mark up the cost of said staff by 4% and an added 33% in benefits all of which was invoiced to the Project. FCG's conversion was fraudulent, willful and with conscious disregard of 125 Broad's rights.

**COUNT VII**
**BREACH OF FIDUCIARY DUTY AGAINST FCG**

128.   Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

129.   FCG had a relationship with 125 Broad of trust and confidence giving rise to fiduciary duties which it subsequently breached.

130.   Here, FCG was empowered to act as 125 Broad's agent as the Construction Manager of the Project. Second, FCG engaged in misconduct by paying the inflated and fraudulent invoices, by billing 125 Broad for employees who did not participate in the Project in a meaningful way and did not contribute the hours charged, by submitting invoices for services not performed or unrelated the Project, and for unrelated items purchased but not delivered to the Project site. Third, 125 Broad suffered damages by being deceived into paying for FCG's employees who did not contribute to the Project in a meaningful way. Further, FCG billed and collected a mark-up fee on these inflated and fraudulent invoices.

131.   As a direct and proximate result of FCG's breach of fiduciary duty, 125 Broad suffered damages.

**COUNT VIII**
**COMMON LAW FRAUD AGAINST FCG**

132.   Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

133.    FCG engaged in both fraudulent inducement and fraudulent concealment as defined by New York law.

134.    FCG made a misrepresentation by submitting invoices that it knew were inflated. Furthermore, it intended to defraud 125 Broad as these invoices were submitted and payment was demanded as if they were legitimate invoices. 125 Broad reasonably relied on FCG as its agent to look out for its best interests in a fiduciary capacity in its role as Construction Manager. Lastly, 125 Broad suffered damages as it was deceived into paying money it would otherwise not have had to pay, had FCG not intentionally mislead it into believing that all invoices were proper. Therefore, FCG is liable to the Plaintiff for fraudulent inducement.

135.    Additionally, FCG engaged in fraudulent concealment when it submitted invoices containing inflated amounts, unrelated expenses, and fraudulent expenses. This misrepresentation was intentionally made as FCG knew that its employees were not working for the Project, that neither RSM nor USDG were involved in the Project, and that several contractors were vastly overcharging for services rendered in connection with the Project. 125 Broad reasonably relied on these misrepresentations as it had no reason to believe that FCG was misleading it or engaging in unscrupulous business practices. In fact, when 125 Broad questioned FCG regarding invoices for FCG's employee time, FCG responded by removing its productive workers to protect its higher paid, nonworking jobs unbeknownst to 125 Broad. FCG's conduct was also egregious and shocked the conscience. Further, 125 Broad suffered damages in the form of having its funds used for improper means due to its trust in FCG. Lastly, FCG owed 125 Broad a duty to disclose material information because there was a fiduciary relationship between them stemming from its position as construction manager of the Project. FCG breached this duty by concealing the actual cost to finish the Project.

## COUNT IX
## <u>DIVERSION OF TRUST ASSETS AGAINST FCG</u>

136.    Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

137.    FCG improperly diverted trust assets in violation of New York Law.

138.    FCG was a trustee of the funds 125 Broad paid to it for the purpose of paying subcontractors. Subsequently, FCG improperly diverted trust funds as it has paid itself and others with these funds rather than using it to pay the various subcontractors. In doing so, it has violated Article 3-A of the Lien Law as it used trust funds for something other than the payments for which they were intended.

## COUNT X
## <u>UNJUST ENRICHMENT AGAINST ALL ED MILLER, FCG, USDG, ROE, RSM, GIOVANNA BATTAGLIA, AND MARGARET MILLER</u>

139.    Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

140.    New York law requires a plaintiff to prove: (1) that the defendant benefitted, (2) at the plaintiff's expense, and (3) that equity and good conscience requires restitution. *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006).

141.    Ed Miller benefited from his scheme by obtaining improvements to his and Giovanna Battaglia's home located at 282 Elwood Ave, Hawthorne, New York as well as obtaining improvements to his parent's home located at 4 Damgard Rd, Andes, New York. Both of these benefits were at 125 Broad's expense as Ed Miller charged 125 Broad for these benefits while purporting that they were related to the Project. Lastly, equity demands that Ed Miller reimburse Plaintiff as he wrongfully took funds from 125 Broad to better himself personally.

142.   FCG benefited by receiving an up to 4% fee for each wrongful invoice charged to the Project and by its no-show employees receiving substantial payments from 125 Broad totaling hundreds of thousands of dollars.

143.   USDG benefitted from receiving payments made to it by FCG. These were made at 125 Broad's expense as USDG was paid for work and services that were never performed and were nonetheless charged to 125 Broad. Equity demands that USDG repay Plaintiff as its payments were obtained through the malfeasance of Ed Miller.

144.   Roe and RSM benefitted from its receipt of payments from 125 Broad for services that were never performed with regards to the Project. Accordingly, 125 Broad was billed for these services despite not receiving any benefit thereof. Moreover, equity demands that Roe and RSM reimburse Plaintiff as Roe and RSM obtained benefits through knowingly submitting fraudulent invoices to the Project via FCG which 125 Broad subsequently paid.

145.   Giovanna Battaglia benefited from Ed Miller's wrongful acts in that she accepted vast improvements to her, and Giovanna Battaglia's home located at 282 Elmwood Ave., Hawthorne, New York. These improvements began at the direction of Ed Miller and were charged to the Project despite Giovanna Battaglia and Ed Miller's personal home having nothing to do with the Project. Accordingly, 125 Broad paid a substantial sum in improving Giovanna Battaglia and Ed Miller's home without its permission or knowledge. Furthermore, equity and good conscience requires that Giovanna Battaglia reimburse Plaintiff for the expense it incurred in improving her and Ed Miller's home.

146.   Margaret Miller benefited from Ed Miller's wrongful acts in that she accepted vast improvements to her home located at 4 Damgard Rd, Andes, New York. These improvements began at the direction of Ed Miller and charged to the Project despite Margaret Miller's personal

home having nothing to do with the Project. Accordingly, 125 Broad paid a substantial sum in improving Margaret Miller's home without their permission or knowledge. Furthermore, equity and good conscience requires that Margaret Miller reimburse Plaintiff for the expense it incurred in improving her home.

**COUNT XI**
**COMMON LAW FRAUD AGAINST PIUMELLI**

147.    Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

148.    Piumelli engaged in both fraudulent inducement and fraudulent concealment as defined by New York law.

149.    Here, Piumelli made a misrepresentation by improperly editing and doctoring ledgers and invoices. Furthermore, he intended to defraud 125 Broad by making these representations in order to ensure that Ed Miller was better able to defraud 125 Broad. 125 Broad reasonably relied on Piumelli as its agent to look out for its best interests in his role with SSE and involvement with 125 Broad. Lastly, 125 Broad suffered damages as it was forced to pay money it would otherwise not have, had Piumelli not intentionally doctored ledgers to incorporate expenses which were unrelated to the Project. Therefore, Piumelli is liable to the Plaintiff for fraudulent inducement.

150.    Further, Piumelli engaged in fraudulent concealment when he reported that the invoices he generated were correct representations of work completed on the Project into invoices being sent to 125 Broad. This misrepresentation was intentionally made as Piumelli was aware that he was incorporating bills that were unrelated to the Project. 125 Broad reasonably relied on these misrepresentations as it had no reason to believe that Piumelli was misleading it or engaging in unscrupulous business practices. Further, 125 Broad suffered damages in the form of having its

funds used for improper means due to its trust in Piumelli. Piumelli's conduct was also egregious and shocked the conscience.

**COUNT XII**
**CONSPIRACY TO COMMIT CIVIL FRAUD AGAINST ED MILLER, FCG, USDG,
ROE, RSM, AND PIUMELLI**

151.    Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

152.    To establish a claim for civil conspiracy, the plaintiff must first establish the underlying tort and then the following elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the conspiracy; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. *McSpedon v. Levine*, 2018 NY Slip Op. 00826 (N.Y. 2d Dept. 2018). Additionally, a conspiracy claim cannot survive a successful aiding and abetting fraud claim but both can be alleged as an alternative to the other. *See*, *e.g.*, *In re Platinum-Beechwood Litig.*, 2020 WL 30335, at *5 (S.D.N.Y. Jan. 2, 2020) (dismissing conspiracy claim because aiding and abetting claim survived).

153.    FCG's role in the conspiracy was to submit the invoices to 125 Broad and embed the illegitimate invoices in with the legitimate invoices. This imbedding further lends itself to the fact that FCG's actions were knowingly fraudulent and in direct violation of New York law.

154.    USDG also took part in this conspiracy by billing the Project for services not rendered. It also accepted payments made to it based on fraudulent invoices it submitted to FCG. 125 Broad suffered damages again in the form of the misappropriated funds and by paying USDG for services not rendered to the Project.

155.    Here, there was an agreement in fact entered into by Ed Miller and RSM to provide ". . . Union Labor Supervision as required." Next, an overt act certainly occurred as payments were

made to RSM for supposedly providing the ". . . Union Labor Supervision. . . [,]" which were never actually rendered as this was a non-union project and even if they had been performed would likely be illegal. RSM intentionally participated in furtherance of the plan by invoicing the Project and taking the money paid to it by FCG on fraudulent invoices. Piumelli participated by incorporating unrelated expenses and bills into the monthly invoices sent to 125 Broad. Lastly, 125 Broad suffered damages in the form of the misappropriated funds and by paying RSM for services not rendered to the Project.

### COUNT XIII
### AIDING AND ABETTING CONVERSION AGAINST FCG, ROE, PIUMELLI AND USDG

156.    Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

157.    A claim can be brought for aiding and abetting conversion when the plaintiff alleges: (1) the existence of a primary violation; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of this primary violation. *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488 (S.D.N.Y. 2003). Such claims may be brought against concurrent, successive, independent, alternative, and even intentional tortfeasors. *Steed Fin. LDC v. Laser Advisers, Inc.,* 258 F. Supp. 2d 272, 283 (S.D.N.Y. 2003) (citing *Raquet v. Braun,* 681 N.E.2d 404, 407 (N.Y. 1997)).

158.    Here, as discussed in Count II, Ed Miller committed the common law tort of conversion. FCG, USDG, Roe, RSM, and Piumelli all had knowledge that Ed Miller was wrongfully converting 125 Broad's property. FCG's knowledge stemmed from its oversight of the Project and its knowledge that work was being billed to the Project that was not actually being conducted. USDG had knowledge on the basis that it is entirely controlled by Ed Miller and thus

his personal knowledge would be imputed to it. Roe and RSM had knowledge of the conversion because they knowingly submitted fraudulent invoices to FCG which Ed Miller then directed FCG to pay. Piumelli had knowledge based on the assistance he provided to Ed Miller. Ed Miller would not have been able to wrongfully convert 125 Broad's property without RSM submitting the fraudulent invoices, thus enabling Ed Miller to funnel the Project's funds to both RSM and himself via USDG.

**COUNT XIV**
**AIDING AND ABETTING FRAUD AGAINST FCG, USDG, ROE, RSM, AND**
**PIUMELLI**

159.    Plaintiff realleges and incorporates the factual allegations in paragraphs 1 through 91, as if fully set forth herein.

160.    To establish a claim for aiding and abetting a fraud, the plaintiff must show: (1) the existence of a primary violation; (2) actual knowledge of the violation by the aider and abettor; and (3) substantial assistance. *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009); *see also William Doyle Galleries, Inc. v. Stettner*, 167 A.D.3d 501, 503 (N.Y. 1st Dept. 2018).

161.    As discussed in Count IV, Ed Miller committed fraud against 125 Broad. Here, FCG, USDG, Roe, RSM, and Piumelli had actual knowledge that Ed Miller was acting unlawfully as he was directing payments to USDG, Roe and RSM from the Project despite none of them providing anything for the Project and each accepted his payments without question. USDG had knowledge on the basis that it is entirely controlled by Ed Miller and thus his personal knowledge would be imputed to it. Roe and RSM had knowledge of the fraud because it knowingly submitted fraudulent invoices to FCG which Ed Miller then directed FCG to pay. Piumelli had knowledge based on his assistance of balancing the books to give the appearance that expenses and invoices unrelated to the Project were actually a part of the Project. Ed Miller would not have been able to

wrongfully convert 125 Broad's property without RSM submitting the fraudulent invoices to FCG, thus enabling Ed Miller to funnel the Project's funds to both RSM and himself via USDG.

## JURY TRIAL DEMAND

162.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury.

**WHEREFORE**, Plaintiff, SECURE SOURCE CLAIMS COMPANY, LLC, demands judgment against the Defendants, in an amount which will compensate it for:

a. Treble damages and attorney's fees on Plaintiff's First Cause of Action;

b. Attorney's fees on Plaintiff's Third, Fifth, Seventh, and Ninth Causes of Action;

c. Disgorgement of Defendants' unlawfully obtained funds;

d. Punitive damages on Plaintiff Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Causes of Action;

e. Costs expended herein, including reasonable and actual attorneys' fees;

f. Pre-judgment and post-judgment interest; and

g. Any and all other relief to which Plaintiff may be entitled.


Dated: November 16, 2022

Respectfully submitted,

By: /s/ Kenneth M. Rehns
Kenneth M. Rehns, Esq.
SDNY No. KR-9822
**WARD DAMON, PL**
4420 Beacon Circle
West Palm Beach, Florida 33407
Telephone No. (561) 594-1446
Facsimile No. (561) 842-3626
Email: krehns@warddamon.com

Counsel for Plaintiff

Howard S. Koh, Esq.
**Meister Seelig & Fein LLP**
125 Park Avenue
7th Floor
New York, New York, 10017
Tel: (212) 655-3500
Fax: (646) 564-4826
Email: hsk@msf-law.com

Local Counsel for Plaintiff